Good morning, your honors, and may it please the court. My name is Arianna Fuller, and I'm here on behalf of the plaintiff Danny Lee Monts, along with my co-counsel Medu Pocha. Mr. Pocha and I would like to split our time such that I address the issue that it was inappropriate for the district court to assess my client's sincerity at summary judgment, and Mr. Pocha will address the qualified immunity issue at summary judgment as well. Do you want to save any time for rebuttal, or do you want to just split time? We were hoping to save a minute, yes. Okay. All right. So four and four? Yes. Or something like that. Okay. So I'd like to talk about my client. My client discovered his Jewish faith when his Jewish father passed away while he was in prison, and he We're very familiar with the factual records. If you want to get right to the heart of your argument, you've got a very short amount of time to get to it. Okay. So the district court erred when it found my client to be insincere at summary judgment, and in fact, the defendants did not contest this in their answering brief. The Supreme Court has held that religious sincerity is a question of fact not to be decided at summary judgment in United States v. Seeger. And in the district court's order determining that my client was insincere, the district court completely failed to mention many of the facts that my client and the defendants produced that our client was, in fact, sincere. The district court failed to mention that my client refused meals in protest for a period of over six months and lost nearly 30 pounds because he couldn't bear to defile his body with the non-kosher food. The court failed to mention that my client persistently requested over six times in a period of less than two years. I thought the record showed that when they transferred him to the Arizona Department of Corrections, he actually weighed more. So did he gain the weight back? He weighed more than when he first came. Than when he was first booked into the jail. Right, but we don't have any evidence in the record that he didn't gain weight and then lose weight prior to requesting the kosher diet. Does he have any medical records to substantiate the 30-pound weight loss? He may, but they're not in the record. But they could essentially be produced. We're stuck with the record, with the state of the evidence as it exists, are we not? Yeah, but there's further evidence in the record. What evidence is there about the weight loss? About the weight loss? Just my client's statement in his deposition that he did lose the weight, and as well as the letters from his fellow inmates that were submitted with his first complaint, stating that he had looked emaciated and was very thin. But there was other evidence that the district court failed to consider, and that was that my client wore his yarmulke as much as he could. He attended religious classes. He obtained and requested permission to celebrate Jewish holidays. And all of this, the court, like just the district court. in any way indicate which branch of Judaism the measurement of sincerity was made? I believe the district court was doing an Orthodox Jewish sincerity, but our client is. . . Which branch of Orthodox Jewish sincerity? Was it Lubavitcher? Oh, Your Honor, I don't believe that that's entirely pertinent to our client's question of religious sincerity because. . . Well, our client does not need to satisfy ecclesiastical definitions of Judaism in order to have a sincerely held religious belief. You're right. But sincere in what sense? I can say, yes, I'm a Jew and not give a damn about any of it. Okay? And there are certain branches of the Jewish religion which would say that's fine. He's a Jew. Yes, Your Honor, and I believe what's important here is that our client sincerely believed he needed to keep kosher in order to maintain a spiritual connection with his God, and that should be sufficient under the Constitution to receive a. . . You're not suggesting that he's got an individual religion, are you? No, Your Honor, he identifies as Jewish because his father was Jewish. So? Well, he doesn't need to satisfy the ecclesiastical definition of Judaism, but I think it would be . . . The ecclesiastical definition among certain Jews. Listen to Judge Duffy's question. It may not be unhelpful that he may not satisfy a particular branch of Orthodox Judaism doesn't mean that there aren't other Jews who would recognize him as Jewish, which is, in fact, what you've argued, isn't it? Correct. Correct, Your Honor. Is that what you're saying? Yes, that is what I'm saying. Okay. I was hoping you'd get used to it. Yeah, so . . . And then further, we would like to point out that the defendants told our client multiple times that he could not convert in prison, that there would be no way that he could actually satisfy the defendants' interpretation of Judaism in order to receive a kosher diet, which cannot be constitutional, and the case cannot be submitted on summary judgment for that reason alone. Do you want to relinquish some time to your co-counsel? Yes. Yes. I'll do Pocha for the appellant, and let me pick up where my colleague left off. As she explained, the defendants in this case told our client, Danny, that he wasn't Jewish under Jewish law, he couldn't prove that he was Jewish, and also he couldn't convert to Judaism while in prison. That conduct on its own should have precluded summary judgment on the qualified immunity question, because it is not reasonable for a prison official to tell a prisoner and impose obstacles that a prisoner cannot meet in order to get a religious accommodation as simple as a kosher diet, one that the prison routinely gave to inmates. Was he a prison official, or was it the volunteer rabbis with whom he consulted who basically all refused to recognize him as a Jew? For the purposes of this Court's analysis, the question on qualified immunity is the rabbi who was entrusted with power over the decision whether or not to grant kosher food. There were other rabbis. I'm kind of surprised that neither of the parties cited the floor decisions of this Court that specifically addressed the situation very similar to this involving the Washington Department of Corrections who relied on an outside volunteer rabbi to make what you call the ecclesiastical determination as to whether an inmate's request for a kosher meal was a legitimate one. Well, Your Honor, And we said that that individual was not a state actor for purposes of 1983. Well, so for With that case Yes, and there are several responses. First of all, Tabachnik, the rabbi who was entrusted with the power to make decisions over Jewish inmates in the prison, through his contract and jail policy became was sufficiently entrusted with power for which his conduct should be We had the same kind of a contract in full. The difference here is, well, first of all, there are two differences. He's not paid, right? No, he is paid. Who? We got a number of different rabbis here. I don't think all of them were paid, were they? The rabbi who, let's be clear, there are different rabbis who submitted declarations in the record, but the rabbi whose conduct is at issue is Rabbi Tabachnik, who did have a contract, a paid contract with the prison, and who also was entrusted as a sole arbiter of who was going to get kosher meals or not by Chaplain Millard. So Millard deferred But Millard deferred to the rabbi as to what I guess I earlier termed the legitimacy of the request. Did he not? Millard deferred Millard who's making the call as to whether this fellow is entitled to call himself. Millard, to be fair, actually acquiesced into what Tabachnik recommended. So Millard Is that why the prison has the contract with the outside minister? No, absolutely not. In this context where we're talking about free exercise rights and prisoners who have no other place to go except the prison officials and chaplains who have been designated to deal with the request, every individual who has power to say yes or no is held responsible for their conduct. So we have Millard and Tabachnik, both of whom are the gatekeepers to Danny's faith. So both of them have the ability to say yes or no to the kosher diet request. If Tabachnik had said yes, then Millard would have rubber-stamped it. And the fact that Tabachnik said no, Millard still had the power to review the record and decide, okay, is this appropriate or not in light of my duties as a prison official under clearly established law. And it's our position that that hasn't happened here. And moreover, for purposes of at least for summary judgment, defendants haven't established that there are no disputed facts over how they reached their decision and their conduct in this case, and that should have precluded summary judgment here. I'd like to reserve the remaining time since we're running out for rebuttal. But let's hear from the state. Or actually, I guess it's the city. The county. The county. The county. Good morning. May it please the Court. James Fritz for Appellees Millard and Tabachnik. In contrast to the other cases regarding sincerity of belief that tend to deal with one single aspect of sincerity, the totality of these circumstances in this case provided it had something for everybody. It has all the information necessary for the Court to have granted summary judgment and granted qualified immunity on behalf of Millard and Tabachnik. So you think this case is more like the Supreme Court's decision in Scott, where the Court relied on the videotape of the high-speed chase in order to claim we don't – this is a proper case for summary judgment because there really is no trialable issue of whether or not here. Correct. Mons doesn't meet the eye test. And even if for some reason you find that there's some kind of constitutional violation here, what is undisputed is that Millard and Tabachnik exercised in good faith, they made detailed investigation, and they acted and made reasonable decisions and actions, thinking that they were within compliance with the law. That's not the rule, is it? I mean, if you think you're not wrong, you can't be held liable? Well, actually, I think the law is that regarding qualified immunity was to give officials like Millard and Tabachnik some breathing room to make reasonable decisions. Breathing room, yes. It's not entirely up to them as to whether they're right or wrong. We have all sorts of public officials who think they're right and turn out to be wrong and turn out to be held liable for it. In this case, the question is, we all know the qualified immunity test, but in this case it seems to me the argument is being made on a factual rather than a legal level. That is, they thought the facts were okay. And I've got to say, I don't understand that as a qualified immunity argument. Well, as a practical matter, Your Honor, officials in the jail in this particular situation have to rely upon the most reliable indicator of behavior. They allowed to say, if you don't qualify as a Jew under Orthodox Judaism provisions, then you don't count as a Jew for our purposes. No. Well, isn't that what happened here? No. What happened was a lawyer wrote a first motion for summary judgment and focused on that orthodoxy. Wait a minute. If we're talking about qualified immunity, we're talking about what they thought at the time of the conduct. What happens months or years later in a summary judgment motion, I don't understand how that's relevant to what the state of the law was at the time that they acted. I didn't say it was not relevant. What I am saying is that it's just one factor. I think the case law does make it reasonable for the chaplains to inquire. I'm losing the thread here. I'm asking a question about is it the state of the law that they could have had a good faith belief, that they were allowed to apply Orthodox Judaism standards for who qualifies as a Jew in order to rule this person out. It seems to me that's what happened. Now, are you telling me that's not what happened or are you telling me that's not the state of the law? I'm telling you that's not what happened. They inquired, investigated whether he was Jewish because he was a moving target. He first claimed he was Orthodox Jew, then he was Reform Jew, then he was a wannabe Jew. And I think that's what they were trying to inquire and investigate. But did they tell him no because you don't meet the requirements of one specific form of Judaism, that you're not Jewish, therefore you're not getting it, you're not sincere. That is not what happened. So I think I understand your argument. They went to three different rabbis, all of whom said this guy's not Jewish. Therefore, Millard said I'm not going to give you access to a kosher diet because you're not Jewish. Otherwise, every inmate in the Maricopa County jail system who perceives kosher food to be better will ask for kosher meals and will have to give it to them, and that's a lot more expensive than what we're spending on the felony loaf. Are we still serving the felony loaf in Maricopa County? Yes, we are, Your Honor. I should have brought one along. We've had enough litigation over Sheriff Arpaio. Thank you. I'm sure you have. I think the point is that they made a reasonable, logical investigation. Now, these two, the chaplain and the rabbi, they aren't the decision makers. They both make recommendations. The decision is actually made by the jail commander. And there's nothing in the record, by the way, while I have the time to tell you that he didn't lose weight. He gained 35 pounds. He had no health issues. There's no record of anything. I think the point the answer I just got was that he says that in his own testimony. Is that the case? That's correct. Is that in the record? That's in the record. Well, then, there is something in the record in support of that proposition. Not from my side, I guess. Well, summary judgment is evaluated based on your side of the record. So for summary judgment purposes, could we say as a matter of law he did not lose weight? I don't think so, can we? No. So why do you tell us that we can? Well, I'm not telling you you can on that point. Why do you tell us it's not in the record? Come on, deal with the record as it is, not as you want it to be. Okay. Point well taken. I would conclude by saying sincerity is not selective and that these two, the chaplain and the rabbi, exercised good faith and that they intended to in every respect as far as they knew they were complying with the law. That is not clearly established. I think the fact that we're here today tells us that sincerity of belief is not a clearly established standard or defined standard. And that's why you have to look at the totality of the circumstances here. And that's why this case, unlike the other cases regarding sincerity of belief, it addresses all of those issues. That's all I have. The problem I have with the argument, though, is that the weight of the case law in the Ninth Circuit I think undercuts what you're saying. I mean, they're basically saying you might be able to get summary judgment on this issue if there is a very well-developed factual record. The question, I guess, is whether or not here there are material facts that are in dispute. Exactly. This was contradiction after contradiction from the get-go. Well, if that's the case, then how can the district court grant summary judgment? Because it's all from his side of it. Well, it's the plaintiff has that burden. From Celotex on forward, your court, this court, and the Supreme Court have given district courts the wherewithal to sort through these cases and decide would a reasonable jury conclude would they fine Fermat? And based upon everything, and there was more than ample evidence, there was the investigation as to whether he was Jewish, there was his own conduct, which was a complete 180 degrees from any of the bare assertions that he made. The judge had, the court, the district court actually had all of that information here, not just one statement. Whether somebody is impeached, his honesty is impeached or not, isn't that generally a question of fact? As a matter of common sense, we all make judgments. And credibility is part of that equation. And the fact of the matter is when it comes down to case law, I think cited by the district court was actually out of New York, was that if this stuff is so incredible and unbelievable, then no reasonable juror would accept it. Oh, look. In that case, I'm quite sure what they were talking about was someone coming into court and claiming that the Martians had landed. God knows I've seen enough of those. All right. Remember, I'm a district judge. I remember, Judge. And we've seen all kinds of nuts. But in this case, what you're saying is this fellow changed his mind from being orthodox to being reformed to being this and that. That's all impeachment material. Well, I think at this stage of the case. That's impeachment material. That's all it is. Well, it's not a material fact, though. Well, it certainly is. Well, if you're making the decision on the spot. On the spot. You don't have that luxury of hindsight that we now have. Well, the person who's apparently taking the lead in making the decision, and his declaration acknowledges that he told the plaintiff he could not convert to Judaism while incarcerated. It's a way of life and so on and so forth. He sets a pretty high standard. In his mind, it's who qualifies as a Jew. And that's the person making the judgment. Why aren't there others who would say, you know, it isn't that hard to be Jewish? In fact, we know there are others who say it isn't that hard to be Jewish. Why do we limit ourselves to the standards set apparently by orthodox ecclesiastical law when we have all the case law saying we don't apply church law? I simply think that Rabbi Cantor Tabachnik was making a common sense, based on experience, statement as to what he understood in case to become Jewish. Thank you. I have nothing further. Thank you very much. Okay. You've got a little more than a minute on rebuttal. Thank you, Your Honors. I would like to address my opposing counsel's statement that the defendants made an investigation into his religious beliefs and I would say that the record does not actually support any investigation beyond ecclesiastical law because in all of the correspondence directed two months from the defendants, they only list ecclesiastical law in their denials. And they didn't come up with these post hoc rationalizations about the canteen receipts and the Christian service and other things until after the suit was filed. And further, I would like to direct the Court's attention to the record regarding Judge Tallman's question about Tabachnik's status as a volunteer. And in ER 238 is a page of his contract where it states that the invitation is for a fixed price purchasing contract, which you can draw an inference that he did receive money from this contract, as well as ER 132, which shows Mont's dietary records as guaranteed or as approved per Taplin-Tabachnik, which further shows that his personal participation in this beyond Judge Tallman's site to that floor case. All right. Very well. Thank you very much. The case just argued is submitted. Very well argued. And thank you again to the Hastings Clinic for taking this matter on. We'll get you an answer as soon as we can. Thank you.
judges: Duffy, Tallman, Clifton